Charles **MANNO** and Susan E. **Manno,** h/w, Plaintiffs,

v.

**AMERICAN GENERAL FINANCE CO.,** Defendant.

No. 05–CV–1222.

United States District Court, E.D. Pennsylvania.

July 12, 2006.

Jack M. Bernard, Philadelphia, PA, for Plaintiffs.

Andrew J. Soven, Barbara Kiely, Reed Smith, LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

In this diversity action, Plaintiffs Charles and Susan E. Manno ("Plaintiffs") bring suit against Defendant American General Finance Co. ("American General"), alleging defamation and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S.

§ 201–1 *et seq.* ("PA CPL"). Before me is Defendant's motion for summary judgment. For the reasons set forth below, I will grant summary judgment as to the PA CPL claim, but deny it as to the defamation claim.

### I. JURISDICTION

Plaintiffs are citizens of Pennsylvania. (Compl. ¶ 1.) Defendant American General is an Indiana corporation with its principal place of business in Evansville, Indiana. (Compl. at 1.) Because the amount in controversy exceeds $75,000, this case falls within my diversity jurisdiction under 28 U.S.C. § 1332.

### II. BACKGROUND[1]

On November 11, 1998, Plaintiffs purchased furniture from Shaw Furniture Gallery ("Shaw") in North Carolina, paying $2,380 at the time of purchase and financing the balance of $5,547. (Pls.' Statement of Uncontested Facts ¶ 1, Pl.'s Resp. Def.'s Mot. Summ. J. at 2 (hereinafter "Pls.' Undisp. Facts").) Shaw assigned Plaintiffs' account to American General, which became responsible for the financing of the balance and its collection from Plaintiffs. (Pls.' Facts ¶ 2.) Plaintiffs claim that the furniture was delivered in damaged condition and that Shaw promised to repair it. (Pls.' Statement of Contested Facts ¶ 1, Pls.' Resp. Def.'s Mot. Summ. J. at 6 (hereinafter "Pls.' Disp. Facts").) Plaintiffs made some payments, but then withheld payment on the balance while awaiting these repairs. (*Id.*) However, Shaw subsequently went bankrupt and no repairs were made. (*Id.*) American General continued to bill Plaintiffs for the outstanding balance owed. (*Id.*) Eventually, on October 16, 2000, American General

---

1. I state the facts in the light most favorable to Plaintiffs, the non-moving parties, and take their allegations as true when supported by proper proofs wherever those allegations conflict with those of Defendant. See *Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004).

accepted $3,961 from Plaintiffs in satisfaction of their debt and sent Plaintiffs the following letter:

> This letter is to confirm that your responsibility on the above referenced account with American General Finance has been settled in full with your final payment in the amount of $3,961.00 received on September 26th, 2000.
>
> Once your check clears the appropriate banking institutions, American General Finance will contact the appropriate credit reporting agencies to update your credit bureau to report this account as 'settled in full' and 'unrated.'

(Pls. Undisp. Facts ¶ 3.) However, Plaintiffs' credit reports continued to reflect the account as a derogatory "charge-off." [2] (*Id.* ¶ 6.) Plaintiffs contacted American General on various occasions to request that American General change the way this account was reported to credit reporting agencies; American General has not done so. (*Id.*) Plaintiffs claim that in 2003, Susan Manno had a telephone conversation with Claudia Luciano, an American General employee, in which Luciano admitted that the report of a "charge-off" was erroneous and agreed to correct it, but that this correction was never made.[3] (Pls.' Disp. Facts ¶ 3; Dep. of Susan Manno at 41–44, 125–37.) Plaintiffs claim that as a result of the derogatory American General account on their credit reports, they sustained damage to their creditworthiness, suffered various denials of credit, and were subjected to higher interest rates. (*Id.* ¶ 8.) On October 7, 2004, Plaintiffs filed suit in the Philadelphia County Court of Common Pleas. American General filed a Notice of Removal in this Court on March 16, 2005. The parties conducted discovery, and Defendant filed the instant motion for summary judgment.

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive summary judgment, a plaintiff must make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will

---

**2.** At various times, two separate American General accounts with different account numbers have appeared on Plaintiffs' credit reports, and the reports have included various different notations regarding the accounts: "Condition: Closed/Paid," "Condition: Derogatory," "Pay Status: Collection/Charge-off," "Pay Status: Collection/Charge," "Remarks: Unpaid balance reported as loss by credit grantor," "Remarks: Payment after charge-off/collection paid profit and loss," and "Remarks: Charge-off Account." (Pls.' Undisp. Facts ¶ 5.)

**3.** As for admissibility, Luciano's statements may fall under the exclusion for admissions of a party-opponent because they appear to have been "statement[s] by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R.Evid. 801(d)(2)(D); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1372 (3d Cir.1992) ("[T]he vicarious admission rule of ... 801(d)(2)(D) does not require that a declarant have authority to bind its employer."). Therefore I may consider them on summary judgment. See *Lexington Ins. Co. v. Western Pa. Hosp.*, 423 F.3d 318, 330 n. 7 (3d Cir. 2005).

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV. DISCUSSION

American General moves for summary judgment both on Plaintiffs' PA CPL claim and on their defamation claim. American General argues that both claims are preempted by the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"),[4] and asserts other, claim-specific reasons for why each claim fails as a matter of law. As discussed below, American General is correct that Plaintiffs' PA CPL claim is preempted by the FCRA. Plaintiffs' defamation claim is not preempted, however, and does not otherwise fail as a matter of law. Accordingly, I will grant summary judgment on the PA CPL claim, but not on the defamation claim.

### A. *PA CPL Claim*

#### 1. Preemption

■ Defendant claims that it is entitled to summary judgment on Plaintiff's PA CPL claim because the PA CPL is preempted by the FCRA. When first enacted in 1968, the FCRA only had one section dealing with preemption of state law claims, 15 U.S.C. § 1681h(e)

("1681h(e)"). This section currently provides, in part:[5]

(e) *Limitation of liability*

... [N]o consumer may bring any action or proceeding *in the nature of defamation, invasion of privacy, or negligence* with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency based on information disclosed pursuant to ... this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report *except as to false information furnished with malice or willful intent to injure such consumer.*

*Id.* (emphasis added). This clause only preempts state claims for defamation, invasion of privacy, and negligence, and only to the extent such claims are not based on malice or willful intent to injure.[6] See *Cushman v. Trans Union*, 115 F.3d 220, 229 (3d Cir.1997). Conversely, claims alleging malice or willfulness are not preempted.

In 1996, Congress amended the FCRA to include, under section 1681t, additional provisions preempting state law. The portion of 1681t relevant to this lawsuit is 1681t(b)(1)(F) ("t(b)(1)(F)" or "the t(b)(1)(F) amendment"), which relates to

---

4. The parties appear to assume that American General is a "furnisher of credit information" and thus subject to the provisions of the FCRA. *See* 15 U.S.C. § 1681s–2 (setting forth duties of furnishers of information to credit reporting agencies).

5. Since its original enactment, 1681h(e) has only been amended once, in a way that is not material to this case. See Act of Sept. 30, 1996, Pub.L. No. 104–208, § 2408 (inserting "or based on information disclosed by a user

of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report" before "except").

6. Although this case involves only a furnisher of credit information, 1681h(e) also applies to preempt claims against "any consumer reporting agency [or] any user of information." *Id.*

claims against furnishers of credit information. Section t(b)(1)(F) provides:

> No requirement or prohibition may be imposed under the laws of any State—
>
> (1) with respect to any subject matter regulated under—
>
> . . . . .
>
> (F) section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—
>
> (i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or
>
> (ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996).[7]

*Id.* This provision preempts state law claims "with respect to any subject matter regulated under . . . section 1681s–2 of this title," which sets forth the duties of credit information furnishers under the FCRA. Section 1681 s–2 provides, *inter alia:* [8]

> A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

15 U.S.C. § 1681s–2(a)(1)(A).

Upon first reading, the newer preemption provision of the FCRA, t(b)(1)(F),
might appear to preempt all state law claims against furnishers of credit information. However, courts have recognized the tension that would exist between such a reading of this section and the FCRA's original preemption clause, 1681h(e). Congress did not repeal or alter 1681h(e) in 1996 when it added the t(b)(1)(F) amendment. However, if t(b)(1)(F) is construed to preempt all state law causes of action against credit information furnishers, it renders 1681h(e) superfluous and effectively works an implied repeal of that provision. See *DiPrinzio v. MBNA Am., Bank, N.A.,* 2005 WL 2039175, at *5 (E.D.Pa. Aug.24, 2005).

■ Repeals by implication are not favored. In the absence of a clear and manifest legislative intent to repeal, statutes that appear to conflict must be read, if possible, to give effect to each. *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). Accordingly, courts have attempted to reconcile t(b)(1)(F) with 1681h(e).[9] Three different approaches have evolved: the "total preemption" approach, the "temporal" approach, and the "statutory" approach. Under the "total preemption" approach, t(b)(1)(F) does indeed preempt all state law claims against furnishers of credit information arising from conduct regulated by 1681 s–2, thus effectively repealing the earlier preemption provision, 1681h(e).[10] Under the

---

7. The two state statutes that are exempted from preemption by this section both involve the obligations of credit information furnishers to provide accurate information to credit reporting agencies.

8. The remainder of 1681s–2 sets forth the duties of furnishers to investigate inaccurate information upon notice of a consumer dispute, delegates responsibility for enforcement of the various provisions of 1681 s–2, and authorizes certain federal agencies to promulgate regulations implementing 1681s–2.

9. My research has revealed no circuit court opinion addressing this question. See *Beyer v. Firstar Bank N.A.,* 447 F.3d 1106, 1108 (8th Cir.2006) (noting that district courts have taken different approaches and declining to reach the question).

10. *See, e.g., Campbell v. Chase Manhattan Bank, U.S.A., N.A.,* 2005 WL 1514221 (D.N.J. June 27, 2005), *amended on reconsid. on other grounds,* 2005 WL 1924669 (D.N.J. Aug.10, 2005); *Purcell v. Universal Bank, N.A.,* 2003 WL 1962376 (E.D.Pa. Apr.28, 2003).

"temporal" approach, preemption depends on whether the cause of action arises before or after a credit information furnisher has notice of a consumer dispute.[11] Finally, under the "statutory" approach, t(b)(1)(F) preempts only state law claims against credit information furnishers brought under state statutes, just as 1681h(e) preempts only state tort claims.[12]

■ Having considered all of these approaches, I find that the statutory approach is the one most consistent with a close analysis of the statutory text and with the congressional intent underlying t(b)(1)(F). Under this approach, t(b)(1)(F) preempts only state statutory claims against credit information furnishers. This reading of the provision reflects the fact that, in enacting t(b)(1)(F), Congress seems to have been most concerned with protecting credit information furnishers from state statutory obligations inconsistent with their duties under the FCRA. See *Carlson v. Trans Union*, 259 F.Supp.2d 517, 521 (N.D.Tex.2003) ("Section 1681t(b)(1)(F) gives every indication of dealing only with state statutory regulation.").

Congress clearly had state statutes in mind when it enacted t(b)(1)(F), because it specifically exempted two state statutes from preemption:

[T]his paragraph shall not apply ... with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or ... with respect to section

1785.25(a) of the California Civil Code (as in effect on September 30, 1996). *Id.* Congress's explicit exclusion of a Massachusetts and a California statutory cause of action from preemption by t(b)(1)(F) is a strong indication that Congress intended t(b)(1)(F) to preempt statutory claims. This focus on state statutory claims becomes even more evident when all the preemption provisions of 1681t are read together as a whole. In addition to the exemptions from t(b)(1)(F) for certain Massachusetts and California statutes, 1681t contains no less than ten additional exceptions to preemption for specific state statutes: t(b)(2) exempts a Vermont statute from preemption, t(b)(3) exempts certain California and Colorado statutes, and t(b)(4) exempts certain Colorado, Georgia, Maine, Maryland, Massachusetts, New Jersey, and Vermont statutes.

Moreover, two subparagraphs of 1681t— t(b)(1)(B) and t(b)(1)(E)—provide that they "shall not apply to any State law in effect on September 30, 1996," the effective date of the 1996 amendments to the FCRA. This indicates that these provisions were intended to preempt only state regulations enacted after the passage of 1681(t). Because it makes no sense to speak of tort causes of action, derived from English common law, as coming into "effect" after a specific date in 1996, any such subsequent state enactments would have to be statutory in nature. As one court has observed: "As § 1681t now stands it may make common sense to read [this section] as applying to state statutory regulations that overlap with the FCRA rather than

---

11. *See, e.g., Kane v. Guar. Residential Lending, Inc.*, 2005 WL 1153623 (E.D.N.Y. May 16, 2005); *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776 (W.D.Ky.2003); *Vazquez–Garcia v. Trans Union De Puerto Rico*, 222 F.Supp.2d 150 (D.P.R.2002); *Aklagi v. Nationscredit Fin.*, 196 F.Supp.2d 1186 (D.Kan. 2002).

12. *See, e.g., DiPrinzio*, 2005 WL 2039175; *Barnhill v. Bank of Am., N.A.*, 378 F.Supp.2d 696 (D.S.C.2005); *Watson v. Trans Union*, 2005 WL 995687 (D.Me.2005); *Johnson v. Citimortgage, Inc.*, 351 F.Supp.2d 1368 (N.D.Ga.2004); *Jeffery v. Trans Union*, 273 F.Supp.2d 725 (E.D.Va.2003).

with state common law torts which have elusive 'effective' dates." *Watson v. Trans Union,* 2005 WL 995687, at *8 n. 8 (D.Me. 2005).

Indeed, 1681t provides that "no *requirement* or *prohibition* may be *imposed* under the laws of any State" with respect to various types of conduct regulated by the FCRA. 15 U.S.C. § 1681t(b) (emphasis added). This language, while a natural-sounding way of forbidding state legislatures to "impose" statutory "requirements" and "prohibitions" on parties subject to the FCRA, would be an awkward, roundabout way of forbidding state courts to interpret tort law to "impose requirements or prohibitions." If Congress intended 1681t to preempt state common law tort actions, it knew well how to express this intent in the statutory language. It need only have mirrored the language of 1681h(e): *"[N]o consumer may bring any action or proceeding* in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency . . . ." *Id.* (emphasis added).

Moreover, the fact that Congress made no mention whatsoever of 1681h(e) when enacting 1681t is in itself evidence that 1681t was not meant to preempt tort causes of action. If Congress had so intended, one would have expected some acknowledgment of the existence of 1681h(e), the FCRA provision that specifically addresses the preemption of state tort claims. Rather than ascribing this omission to congressional forgetfulness, the statutory approach presents a much more satisfactory explanation: Congress had no need to address 1681h(e) when enacting 1681t because the former relates solely to torts, while the latter relates solely to statutes.

■ By the same token, interpreting t(b)(1)(F) to preempt only statutory claims makes this newer preemption provision harmonize with 1681h(e). *See DiPrinzio,* 2005 WL 2039175 at *6 ("When read alongside section 1681t(b)(1)(F) . . . the symmetry is clear: section 1681h(e) applies to state common law and section 1681t(b)(1)(F) applies to state statutes."). "[S]tatutory provisions enacted at different times should be read as harmoniously as possible, so that each is given effect and the provisions do not conflict." *Pennsylvania v. Dep't of Health and Human Servs.,* 723 F.2d 1114, 1119 (3d Cir.1983). Under the statutory approach, the two provisions can easily be read together to shield credit information furnishers against, on one hand, state statutory claims, and on the other hand, state tort actions not involving willful or malicious conduct.[13] For all of the above reasons, I adopt the statutory approach to preemption under t(b)(1)(F).

■ I find the other two approaches that courts have taken to be unpersuasive. Of the three, the "total preemption" approach appears to enjoy the least support. Under this approach, t(b)(1)(F) is interpreted to supersede and effectively repeal 1681h(e) even though Congress specifically left 1681h(e) in place and did not address it when adding t(b)(1)(F) in 1996. Such a reading of t(b)(1)(F) ignores the canon of statutory construction that one provision of a statute should not be read to render another superfluous, *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), and that repeal of a statutory provision is generally not to be presumed from congressional silence,

**13.** Although not determinative of my decision, I note that the statutory approach has the practical advantage of being a readily administrable rule, under which a court need only ask whether a state law claim is statutory to determine whether it is preempted.

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). This canon is especially relevant where preemption is concerned, because principles of federalism require that preemption rest on the "clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Thus, I do not find the total preemption approach persuasive.

As for the "temporal" approach, while a substantial number of courts have adopted it, others have considered it "strained at best." *DiPrinzio*, 2005 WL 2039175 at *6 (quoting *Gordon v. Greenpoint Credit*, 266 F.Supp.2d 1007, 1013 (S.D.Iowa 2003)). The temporal approach rests on two propositions: first, that the t(b)(1)(F) amendment preempts only state law claims alleging conduct that is "regulated under ... section 1681s–2" (the section that regulates credit information furnishers), and second, that a claim against a credit information furnisher is not "regulated under section 1681 s–2" unless and until the furnisher has notice of a consumer dispute.[14] *Kane v. Guar. Residential Lending, Inc.*, 2005 WL 1153623, at *8 (E.D.N.Y. May 16, 2005). Consequently, the temporal approach applies t(b)(1)(F) to preempt all state law claims involving conduct *after* the furnisher has notice of a dispute. The temporal approach reconciles t(b)(1)(F) with 1681h(e) by maintaining that 1681h(e) still applies to preempt state law claims against furnishers arising *before* the furnisher has notice of a dispute unless those claims involve malice or willful conduct. See *Kane*, 2005 WL 1153623 at *8.

■ I disagree with both premises on which the temporal approach is based. Clearly the t(b)(1)(F) amendment preempts state regulation "with respect to any subject matter regulated under ... section 1681 s–2." However, there is no indication whatsoever that Congress meant this phrase to be taken in a temporal sense. 1681 s–2 sets up a comprehensive scheme that regulates many aspects of the conduct of credit information furnishers.[15] Thus, Congress would have intended "any subject matter regulated under ... 1681s–2" to refer to any conduct by credit information furnishers relevant to their regulation under 1681 s–2, not merely their conduct after a certain point in time.[16] It follows that t(b)(1)(F) was not meant to preempt only those state law claims against furnishers that arise after a certain point in time. Thus, the phrase "regulated under ... section 1681 s–2" is unable to

---

14. The courts espousing the temporal approach seem to rely on notice of a dispute as the trigger for preemption under t(b)(1)(F), although there is a split on whether notice of a dispute from anyone is sufficient, or only notice from a credit reporting agency. *Compare Ryder v. Washington Mut. Bank*, 371 F.Supp.2d 152 (D.Conn.2005) (notice from anyone triggers preemption) with *Harrison v. Ford Motor Credit Co.*, 2005 WL 15452 (D.Conn. Jan.3, 2005) (only notice from credit reporting agency).

15. 1681 s–2(a) imposes a general duty upon furnishers to report accurate information and sets forth detailed reporting requirements; s–2(b) requires furnishers to take certain steps to verify information upon notice of a con-

sumer dispute from a credit reporting agency; s–2(c) and (d) set forth who may and may not enforce violations of 1681 s–2; and s–2(e) authorizes the promulgation of implementing regulations.

16. Of course, t(b)(1)(F) does not preempt state law claims against credit information furnishers based on conduct other than the furnishing of credit information. *See, e.g. Hutchinson v. Delaware Sav. Bank FSB*, 410 F.Supp.2d 374, 385 (D.N.J.2006) (to extent that plaintiffs sued furnishers for wrongfully attempting to collect loan after plaintiffs' bankruptcy discharge, claims fell outside conduct regulated by FCRA and were not preempted under t(b)(1)(F)).

bear the heavy interpretive weight that the temporal approach places on it.

As for what seems to be the second premise, even if I accepted that a furnisher were not "regulated under 1681 s–2" until a specific moment, there is no reason to think that notice of a dispute would be that moment. 1681s–2 forbids a credit information furnisher to report inaccurate information whenever there is reasonable cause to doubt its accuracy, not just when the furnisher has notice of a specific dispute:

> A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person

knows or has reasonable cause to believe that the information is inaccurate.[17]

15 U.S.C.A. § 1681s–2(a)(1)(A). Thus, under 1681s–2(a)(1)(A), a furnisher is prohibited from reporting inaccurate information even when it has only constructive knowledge of inaccuracy.[18] Because 1681s–2 imposes a duty on furnishers to report accurate information regardless of whether they have notice of a specific dispute, the conduct of a furnisher would seem to still be "regulated under section 1681s–2" prior to the moment the furnisher has notice of a dispute. Therefore, there is no reason to think that Congress intended for preemption under t(b)(1)(F) to be triggered at the instant a furnisher is notified of a dis-

**17.** This section originally prohibited a furnisher from providing inaccurate information where it "knows or *consciously avoids knowing* that the information is inaccurate." 15 U.S.C. § 1681s–2(a)(1)(A) (2002) (emphasis added). As part of the 2003 amendments to the FCRA, this was changed to "knows or has reasonable cause to believe that the information is inaccurate." Fair and Accurate Credit Transactions Act of 2003, Pub.L. No. 108–159, § 312. In doing so, Congress lowered the degree of knowledge of an inaccuracy that triggers a furnisher's duties under 1681 s–2 from an actual knowledge/willful ignorance standard to a constructive knowledge standard.

**18.** I recognize that this provision is entitled "Reporting information with actual knowledge of errors," but this does not mean that the duties imposed on furnishers by 1681 s–2 arise only after notice of a specific dispute. "[T]he title of a statute cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase." *Pa. Dep't of Corrections v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (citations omitted). Here, the text of the statute clearly refers to "reasonable cause to believe that the information is inaccurate," which indicates that a furnisher's duty of accurate reporting under 1681s–2(a)(1)(A) arises upon constructive, as well as actual knowledge of an inaccuracy.

Indeed, the statute defines "reasonable cause to believe that the information is inaccurate," for purposes of 1681s–2(a)(1)(A), as "having specific knowledge, *other than solely allegations by the consumer,* that would cause a reasonable person to have substantial doubts about the accuracy of the information." 15 U.S.C.A. § 1681s–2(a)(1)(D) (emphasis added). This confirms the fact that "reasonable cause" to know of an inaccuracy, such as would trigger the furnisher's duties under 1681s–2(a)(1)(A), is not the same as notice of a dispute but a different standard entirely. Of course, notice of a dispute can lead to "reasonable cause" to know of an inaccuracy, but a furnisher could clearly also have reasonable cause to doubt information's accuracy before the consumer specifically disputes it. The present case provides a perfect example of such a scenario. American General was apparently reporting Plaintiffs' account as a "charge-off" since before October 2000, when Plaintiffs settled the balance and received notice that the account would be reported as "paid in full." Plaintiffs did not discover and dispute the fact that the account was still being reported as a "charge-off" until some time later. However, if "charge-off" was in fact an inaccurate description of Plaintiffs' account as of the October 2000 settlement, then American General certainly had "reasonable cause" to know of this inaccuracy, given that it had promised to report the account otherwise.

pute.[19] See *DiPrinzio*, 2005 WL 2039175 at *6; *Gordon*, 266 F.Supp.2d at 1012–13.

Courts have also pointed out another flaw in the temporal approach, namely that it paradoxically affords more legal protection to information furnishers after they are on notice of a dispute, when one would expect their liability to be *greater*:

> [T]he court finds the practical effect [of this approach] troubling. The newer statute, [§ 1681t(b)(1)(F) ], provides furnishers of information with much greater protection (potentially no lawsuits) than does the older statute, § 1681h(e) (allowing defamation actions premised on malice or willfulness). To read the two statutes in [this way] has the effect of giving a furnisher of information more protection from exposure to liability for acts committed after receiving notice of dispute than for acts committed before such notice. It seems odd ... that Congress intended to protect furnishers of information more once they have knowledge that a consumer is disputing an item on his credit report; one would, logically, expect the opposite policy.

*Johnson*, 351 F.Supp.2d at 1374–75 (quoting *Neal v. Equifax Info. Servs., Inc.*, No. 03–CV0761 (N.D.Ga. Mar. 11, 2004) (Carnes, J.)). For all of these reasons, the temporal approach, though superior to the total preemption approach, is an unsatisfactory way of reconciling 1681t(b)(1)(F) and 1681h(e).

■ When one examines t(b)(1)(F) in the context of 1681t and the FCRA as a whole, one can discern a congressional intent to limit the preemptive effect of t(b)(1)(F) to state statutory causes of ac-

tion. Because the statutory approach to preemption under t(b)(1)(F) is the only approach that effectuates this intent, I join the courts that have adopted it. Because Plaintiff's PA CPL claim is a statutory cause of action, it is preempted by t(b)(1)(F), and Defendant is entitled to summary judgment on this claim. *See DiPrinzio*, 2005 WL 2039175 at *7. In light of my decision that this claim is preempted by the FCRA, I do not reach American General's alternative contention that its conduct cannot, as a matter of law, be the subject of a PA CPL claim.

### B. *Defamation Claim*

Plaintiffs also sue American General for defamation. American General asserts that this count fails as a matter of law for five reasons: (1) it is preempted by § 1681h(e) of the FCRA because there is no evidence of malice or willful conduct; (2) there is no evidence that American General ever made a defamatory statement about Plaintiffs—all the negative information allegedly spread about Plaintiffs was reported by credit reporting agencies; (3) even if attributed to American General, the statements of the reporting agencies are not defamatory because they are true; (4) some statements may have been outside the one-year statute of limitations for defamation claims; and (5) there is no admissible evidence that Plaintiffs suffered damages as a result of American General's conduct.

#### 1. Preemption

■ According to the statutory approach to preemption under t(b)(1)(F),

---

19. At least one court to adopt the temporal approach seems to have hinted that it might apply to preempt all claims "relating to the obligations of furnishers of information once they know, *or have reason to know*, about possible inaccuracies." *Stafford v, Cross Country Bank*, 262 F.Supp.2d 776, 785 (W.D.Ky.2003) (emphasis added). Because, as already noted, I do not think that t(b)(1)(F) was meant to have any temporal aspect at all, I also reject a version of the temporal approach that would preempt state law claims from the moment a furnisher had "reasonable cause" to know of an inaccuracy.

which I adopt, Plaintiffs' defamation claim is not preempted by t(b)(1)(F) because it is not statutory in nature. However, I must still decide whether it is preempted by 1681h(e), the original preemption section of the FCRA. That provision preempts all defamation, invasion of privacy, and negligence claims by a consumer "except as to false information furnished with malice or willful intent to injure such consumer." *Id.* Thus, I must determine whether Plaintiffs' defamation claim is one involving "malice or willful intent to injure" within the meaning of 1681h(e).

■■■ The Third Circuit has assumed without deciding that the standard for "malice or willful intent to injure" under 1681h(e) is the same as the standard for an award of punitive damages for a willful violation of the FCRA under 15 U.S.C. § 1681n.[20] *Cushman,* 115 F.3d at 229. "To show willful noncompliance with the FCRA [under 1681n], [a plaintiff] must show that [the defendant] 'knowingly and intentionally committed an act in conscious disregard for the rights of others,' but need not show 'malice or evil motive.'" *Cushman,* 115 F.3d at 226. The Third Circuit has established the contours of what constitutes a willful violation of the FCRA so as to support punitive damages:

> [T]o justify an award of punitive damages, a defendant's actions must be on the same order as willful concealments or misrepresentations. If [plaintiff] can prove ... [t]hat [defendant] adopted its

reinvestigation policy either knowing that policy to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy contravened those rights, she may be awarded punitive damages.

115 F.3d at 227. A willful violation may be found "where the evidence shows that inaccuracies in credit reports arise from something more than 'an isolated instance of human error which [the agency] promptly cure[s].'" *Sheffer v. Experian Info. Solutions, Inc.,* 2003 WL 21710573, at *3 (E.D.Pa. Jul.24, 2003) (quoting *Boris v. Choicepoint Servs.,* 249 F.Supp.2d 851, 862 (W.D.Ky. Mar.14, 2003); *Farren v. RJM Acquisition Funding, LLC,* 2005 WL 1799413, at *8 (E.D.Pa. Jul.26, 2005)).

Recognizing that whether an act was done with knowing or reckless disregard for another's rights is a fact-intensive question, courts have been wary of awarding summary judgment on credit reporting defamation claims on this ground. See *Cushman,* 115 F.3d at 229 (reversing judgment as a matter of law); *Lawrence v. Trans Union,* 296 F.Supp.2d 582, 592 (E.D.Pa.2003) (denying summary judgment); *Crane,* 282 F.Supp.2d at 322 (same); *Sheffer,* 2003 WL 21710573, at *3 (same); *but see Farren,* 2005 WL 1799413 at *8 (granting summary judgment); *O'Connor,* 1999 WL 773504 at *8 (same). Similarly, in defamation actions outside the

---

**20.** To be precise, in *Cushman,* the Third Circuit assumed the standards were the same because the parties and the district court had so assumed, while noting that at least one circuit has held that malice or willful conduct under 1681h(e) involves a "higher requirement of proof" than a willful violation under 1681n. *Cushman,* 115 F.3d at 229 (citing *Thornton v. Equifax, Inc.,* 619 F.2d 700, 706 (8th Cir.1980)). Similarly, in the present case, no party has suggested an alternative standard for "malice or willful intent to in-

jure." Thus, I will proceed on the same assumption as the *Cushman* court, as I and other judges of this Court have done in the past. See *Lawrence v. Trans Union,* 296 F.Supp.2d 582, 590–91 (E.D.Pa.2003) (Brody, J.); *Farren v. RJM Acquisition Funding, LLC,* 2005 WL 1799413, at *8 (E.D.Pa. Jul.26, 2005); *O'Connor v. Trans Union,* 1999 WL 773504, at *7 (E.D.Pa. Sept.29, 1999); *Crane v. Trans Union,* 282 F.Supp.2d 311, 322 (E.D.Pa.2003).

credit reporting context, Pennsylvania courts have observed that proof of malice "calls a defendant's state of mind into question, and does not readily lend itself to summary disposition." *Raffensberger v. Moran*, 336 Pa.Super. 97, 485 A.2d 447, 454 (1984).

■ Plaintiffs contend that 1681h(e) does not preempt their defamation claim because there is evidence from which a jury could infer that American General knowingly or recklessly disregarded their rights. Plaintiffs note that under Pennsylvania defamation law, malice may be shown by circumstantial evidence, *Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185, 192 (Pa.Super.2003), such as the continued publication of a falsehood after the injured party requests a retraction, *Clark v. North Am. Co.*, 203 Pa. 346, 53 A. 237, 239 (1902). Here, Plaintiffs claim that the abundance of evidence that American General knew of Plaintiffs' dispute, coupled with its failure to rectify the situation, could give rise to an inference of knowing or reckless conduct. Plaintiffs point out that American General acknowledged the settlement of Plaintiffs' account in October 2000 and promised to stop reporting the account as delinquent, but nonetheless kept reporting the account as "charged-off" despite numerous protests by Plaintiffs. In addition, Susan Manno has testified that in 2003, she had a telephone conversation with an American General employee who admitted that the "charge-off" characterization was erroneous and agreed to correct it, but that this correction was never made.[21]

Under these circumstances, Defendant can hardly claim that it had no notice of the Plaintiffs' dispute, or that the reporting of Plaintiffs' account as delinquent was "an isolated instance of human error which [the agency] promptly cure[d]." *Sheffer*, 2003 WL 21710573 at *3. If a jury found that American General's characterization of Plaintiffs' account as delinquent was false,[22] then it could reasonably conclude that this intentional reporting of false information was done "knowingly and intentionally ... in conscious disregard for the rights of others." *Cushman*, 115 F.3d at 226. Therefore, Plaintiffs' defamation claim is not preempted under 1681h(e).

## 2. Publication

■ American General also argues that Plaintiffs have not met the "publication" element of their defamation claim. In Pennsylvania, the burden of proof for a common law defamation action is set forth by statute: [23]

(a) *Burden of plaintiff.*—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

---

21. As already noted, the employee's statements may fall within the hearsay exception for admissions by a party-opponent under Fed.R.Evid. 801(d)(2).

22. Although I express no opinion as to whether the characterization was false, as discussed at section IV.B.4 infra, I conclude that a reasonable jury could so find.

23. This statute merely codified the common law of defamation in Pennsylvania with regard to the burden of proof. *Hepps v. Phila. Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374, 378 (1984), *rev'd on other grounds*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). It does not make defamation a statutory cause of action in Pennsylvania, nor does any party so argue.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S.A. § 8343; *Porter v. Joy Realty, Inc.*, 872 A.2d 846, 849 (Pa.Super.2005). One of the elements is that the defendant must have "published" the defamatory statement, i.e., communicated it to at least one third party. *Elia v. Erie Ins. Exchange*, 430 Pa.Super. 384, 634 A.2d 657, 660 (1993); *see also Cushman*, 115 F.3d at 230.

■ Here, American General claims that Plaintiffs have no direct evidence that it ever "published" the alleged derogatory credit information, because Plaintiffs' only evidence of publication consists of reports by third party credit reporting agencies.[24] However, I find that Plaintiffs have raised a genuine issue as to whether American General published derogatory information about them to reporting agencies. Plaintiffs have produced recent credit reports reflecting a derogatory American General account. Because the reporting agencies obviously did not generate this information themselves, a jury could reasonably infer that American General provided it to them, although this inference depends on the usual procedures for communication of credit information between furnishers and reporting agencies. Pennsylvania law explicitly allows the publication requirement to be met where there is "substantial circumstantial evidence" that a defamatory statement was made. *Porter*, 872 A.2d at 849; *see also Cushman*, 115 F.3d at 230 (jury could infer that credit reporting agency published derogatory information from fact that bill collector communicated that information to plaintiff). Such is the case here.[25]

### 3. Statute of Limitations

■ In Pennsylvania, the statute of limitations for defamation claims is one year from the date of publication. 42 Pa. C.S.A. § 5523; *Oldroyd v. Assoc. Consumer Discount Co./PA*, 863 F.Supp. 237, 242 (E.D.Pa.1994). Plaintiffs brought suit on October 7, 2004. American General claims that "to the extent any statements can be identified or attributed to American General, if the statement was made prior to October 7, 2003, it cannot be used in support of a defamation claim." American General has not argued that *all* communications that could arguably give rise to a defamation claim occurred prior to this date, so as to entitle it to summary judgment. If American General seeks summary

---

**24.** At this stage, I express no opinion on the extent of American General's liability for the republication of the derogatory information by third-party credit reporting agencies. See *generally* M.C. Dransfield, Annotation, *Liability of publisher of defamatory statement for its repetition or republication by others*, 96 A.L.R.2d 373 (1964). Nor do I address the effect, if any, of Pennsylvania's Uniform Single Publication Act, 42 Pa.C.S.A. § 8341, which provides: "No person shall have more than one cause of action for damages for libel or slander, or invasion of privacy, or any other tort founded upon any single publication.... Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." *Id.; see Bradford v. Am. Media Operations, Inc.*, 882 F.Supp. 1508 (E.D.Pa.1995).

**25.** American General also notes that under Pennsylvania law, "[a] complaint for defamation must, on its face, identify specifically what allegedly defamatory statements were made, and to whom they were made." *Moses v. McWilliams*, 379 Pa.Super. 150, 549 A.2d 950, 960 (1988). Here, however, Plaintiffs have met this burden: they have alleged and submitted evidence that American General made defamatory statements about their credit to credit reporting agencies.

judgment on the ground of statute of limitations, on which it bears the burden of proof, it has the obligation to affirmatively point out the absence of evidence of alleged defamatory statements on or after October 7, 2003, and it has not done so. *See In re Bressman,* 327 F.3d 229, 237–38 (3d Cir.2003) (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991)) (where moving party bears burden of proof on issue for which summary judgment is sought, it must show affirmatively the absence of a genuine issue of material fact).

Summary judgment would be improper in any event, because Plaintiffs have evidence that American General made at least one publication of the derogatory information to a credit reporting agency within the statute of limitations. A credit report for Charles Manno from July 19, 2004 indicates that American General reported derogatory account information to the credit reporting agency Experian on October 7, 2003. (Def.'s Reply Supp. Mot. Summ. J. Ex. F at 18.) Accordingly, the statute of limitations is not a proper ground on which to grant summary judgment to American General.

### 4. Truth/Falsity

 American General asserts that Plaintiffs cannot prevail on their defamation claim because the allegedly defamatory statements—i.e., the derogatory notations in their credit reports—are all true. Pennsylvania law places the burden of proving the truth of a defamatory statement on the defendant:

(b) *Burden of defendant.*—In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

(1) The truth of the defamatory communication.

. . . . .

42 Pa.C.S.A. § 8343. Only where the plaintiff is a public official or public figure, the defendant is a member of the media, or the statement in question bears on a matter of public concern, does the First Amendment compel the plaintiff to prove falsity as an element of the claim. *Lewis v. Philadelphia Newspapers, Inc.,* 833 A.2d 185, 191 (Pa.Super.2003). Here, Plaintiffs are not public figures, American General is not a member of the media, and the statement is not a matter of public concern. Thus, American General retains its statutory burden of proving truth as a defense. *See Simms v. Exeter Architectural Prods., Inc.,* 916 F.Supp. 432, 437 (M.D.Pa.1996).

 Where the moving party has the burden of proof at trial on the issue for which summary judgment is sought, it must show affirmatively that no reasonable jury could find for the non-moving party on that issue. *See Bressman,* 327 F.3d at 237–38. Here, American General cannot show that the information it published to credit reporting agencies about Plaintiffs is true as a matter of law. American General claims that it reported Plaintiffs' account as partially "charged off" because it was in fact "charged off," i.e. settled for less than the full amount. American General relies on an Eleventh Circuit FCRA case in which the court stated:

[W]e cannot conclude that a debt which has been charged off by the creditor and is later settled for an amount less than the original balance due should be reported without any derogatory references on a credit report. This information, which reflects the efforts required to collect a debt, is clearly of interest to potential creditors and would be effectively hidden by a credit report that treated the account as being in good standing.

*Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1158 (11th Cir.1991). Under the unique factual circumstances of this case, however, there is a genuine issue as to whether "charged off" is a true characterization of the state of Plaintiffs' American General account. Plaintiffs had what they considered a legitimate dispute about the bill for their furniture; they claim that it was damaged and that Shaw promised to repair it but never did so. Plaintiffs resolved the account for a lump sum payment with American General, which sent a letter to Plaintiffs stating: "Once your check clears the appropriate banking institutions, *American General Finance will contact the appropriate credit reporting agencies to update your credit bureau to report this account as 'settled in full' and 'unrated.'*" (Pls.' Undisp. Facts ¶ 3 (emphasis added).) Furthermore, Plaintiffs claim that in 2003, an American General employee admitted that the account should not still have been reported as a charge-off. (Pls.' Disp. Facts ¶ 3.) This alleged statement, along with American General's 2000 letter to Plaintiffs, raises a genuine issue as to whether American General *itself* even considers Plaintiffs' account properly referred to as a "charge-off." American General bears the burden of proving the truth of the statement, and it has not demonstrated that no reasonable jury could find that the characterization of Plaintiffs' account as a derogatory "charge-off" is false.

### 5. Damages

▮▮▮ Under Pennsylvania law, as another element of their defamation claim, Plaintiffs must show harm resulting from American General's publication of defamatory material. While a plaintiff alleging slander [26] must ordinarily show "special harm," [27] "a plaintiff in libel [28] ... need not prove special damages or harm in order to recover; he may recover for any injury done his reputation and for any other injury of which the libel is the legal cause." *Dougherty v. Boyertown Times*, 377 Pa.Super. 462, 547 A.2d 778, 782 (1988) (quoting *Agriss v. Roadway Exp., Inc.*, 334 Pa.Super. 295, 483 A.2d 456, 474 (1984)). Because the defamatory statements at issue in this case were printed in Plaintiffs' credit reports, their claim is for libel. Thus, Plaintiffs need not show special harm resulting from the defamation; they need only show "actual harm," which may include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Agriss*, 483 A.2d at 467.

▮▮▮ Because Plaintiffs need only prove actual harm to prevail on their defamation claim, I need only decide at this juncture whether Plaintiffs have sufficient evidence of actual harm, not of special harm. [29] Ac-

---

26. Slander is defamation by oral statements, or "[t]he speaking of base and defamatory words tending to prejudice another in his reputation...." Black's Law Dictionary 1388 (6th ed.1990).

27. "Special harm" is specific monetary or out-of-pocket loss caused by the defamation. *Synygy, Inc. v. Scott–Levin, Inc.*, 51 F.Supp.2d 570, 580 (E.D.Pa.1999) (citing Restatement (Second) of Torts, § 575 (1976)). A plaintiff alleging slander must show special harm unless the defamatory statements in question constitute slander *per se. Id.*

28. Libel is "[a] method of defamation expressed by print, writing, pictures, or signs." Black's at 915.

29. Plaintiffs have testified to several denials of credit that they claim were caused by the erroneous American General account on their credit reports; this is the kind of specific monetary loss that would constitute special harm. American General argues that all of Plaintiffs' evidence to that effect is uncorroborated hearsay, and that Plaintiffs have not shown a causal link between any of these denials of credit and the derogatory American General account. In particular, American

tual harm may include personal humiliation as well as mental anguish and suffering. *Agriss,* 483 A.2d at 467; *Laniecki v. Polish Army Veterans Ass'n of Lucyan Chwalkowski,* 331 Pa.Super. 413, 480 A.2d 1101, 1106 (1984) (defamation plaintiff may recover for humiliation, defined as "a feeling of degradation or inferiority or a feeling that other people will regard [one] with aversion or dislike."); *compare Sheffer,* 2003 WL 21710573 at *3 (holding that, in a FCRA case, "[a]t the very least, Plaintiff may be entitled to damages for the emotional distress he may have suffered."). Therefore, American General is not entitled to summary judgment on this ground.

## V. CONCLUSION

For the foregoing reasons, I will grant summary judgment to American General on Plaintiffs' PA CPL claim, but deny summary judgment on Plaintiffs' defamation claim.

### ORDER

AND NOW, this 12th day of July, 2006, it is **ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 16) is **GRANTED IN PART AND DENIED IN PART:**

(1) with respect to Plaintiffs' claim under the Pennsylvania Unfair Trade Practices and Consumer Protection law, the motion is **GRANTED;**

(2) with respect to Plaintiffs' claim for defamation, the motion is **DENIED.**

General notes that there are other derogatory items in Plaintiffs' credit histories that could have caused the denials of credit. I note that Plaintiffs need not have an otherwise perfect credit history to claim that American General's erroneous reporting of their account worsened their credit scores and led to denials of credit. This case is not like *Neptune v,* *Trans Union,* 1993 WL 505601 (E.D.Pa. Dec.8, 1993), a FCRA case where summary judgment was granted to the defendant because plaintiff's credit history was so egregiously poor as to preclude any reasonable juror from concluding that his alleged denials of credit were caused by defendant's erroneously reported information. *Id.* at *2.